UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAMELA G. KENDALL-VANCLEVE, )
                                )
           Plaintiff,            )
                                  )
vs.                                 )     Case No. 2:06CV00018 DJS (AGF)
                                  )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,    )
                                  )
           Defendant.        )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

        This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Pamela Kendall-VanCleve's

application for disability insurance benefits under Title II of the Social Security Act, 42

U.S.C. §§ 401-434, and supplemental security income under Title XVI of the Act, id.

§§ 1381-1384f.  The action was referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b) for recommended disposition.  For the reasons set forth

below, the Court recommends that the decision of the Commissioner be reversed and that

the case be remanded with directions to award Plaintiff benefits from her alleged onset

date.

        Plaintiff, who was born on August 20, 1976, applied for benefits on July 28, 2003,

claiming a disability onset date of June 14, 2003, due to anxiety and depression.  After

her application was denied at the initial administrative level, Plaintiff requested a hearing

before an Administrative Law Judge ("ALJ"). A hearing was held on October 28, 2004, at which Plaintiff was represented by counsel. On December 13, 2005, the ALJ issued a decision that absent the effects of substance abuse, Plaintiff was not disabled as defined by the Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on January 24, 2006. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ erred in not giving proper weight to the opinions of two treating psychiatrists (Drs. Howard Houghton and Patricia Hogan), and in assessing a Residual Functional Capacity ("RFC") for Plaintiff that was not supported by the record or by medical evidence. Plaintiff asks that the decision of the Commissioner be reversed and benefits awarded, or alternatively, that the case be remanded to the Commissioner for a proper assessment of Plaintiff's RFC.

**Earnings Record**

The only somewhat significant earnings shown on Plaintiff's earnings record were approximately $5,600 in 1993, $3,300 in 1999, $6,600 in 2000, $13,300 in 2001, and $7,700 in 2002. Tr. at 112.

**Medical Record**

The record reflects that Plaintiff began using illegal drugs at an early age, starting with marijuana at age 11, and methamphetamine at age 14. In late 1998 or early 1999, she was arrested after chemicals for the manufacture of methamphetamine were found in her car, and in 2000, she was placed on five years probation. Plaintiff also had a history

of mental problems. Plaintiff began a drug rehabilitation program on July 15, 1999. A discharge summary from the program dated February 16, 2000, indicated that she failed to complete the program successfully, and that she was discharged because she was using drugs while in outpatient treatment. Tr. at 177.

On March 2, 2000, following a recent drug relapse, Plaintiff was seen by a psychologist, upon referral by her probation and parole officer. Plaintiff's presenting problems included depression of two to three years, lately crying "all the time" related to the death of her mother in 1998, and having her two children taken away by the Division of Family Services. Plaintiff denied "all but mild infrequent depression" until the more severe onset two to three years ago. She was not on any current medications, Zoloft and Paxil having been ineffective. Plaintiff reported severe insomnia, and a decrease in concentration, with the notation "baseline okay" appearing in the clinical notes. She reported that she had been drug-free for one year with a relapse one week ago. Plaintiff was diagnosed with "major depression, single episode, severe," amphetamine dependence, and a possible panic disorder. She was prescribed Remeron for her depression. Tr. 180-81.

A mental health outpatient assessment dated July 11, 2000, indicated that Plaintiff had ongoing depression with a history of amphetamine dependence. Plaintiff asserted that she had been drug-free for several months, and she was referred for a psychiatric evaluation. Tr. at 183-84. The record includes mental health treatment notes by psychiatrist Armando Favazza, M.D., from January 27, 2001, through August 11, 2003.

On January 27, 2001, Plaintiff, who was then taking Xanax and Effexor, reported that she was "doing OK." Tr. at 185. Dr. Favazza's treatment notes dated February 14, 2001, indicated that Plaintiff stated she was "alright," and that she was "still doing well at school and at work." Tr. at 186. Subsequent treatment notes through May 13, 2002, similarly indicated that Plaintiff was doing okay. Tr. at 187-96. On August 12, 2002, Plaintiff reported that she was drug-free for two and one-half years, and was only one semester away from obtaining an associates degree. Tr. at 205.

On November 11, 2002, Plaintiff reported to Dr. Favazza that "everything has changed." She had separated from her husband and was tearful. Tr. at 208. On January 27, 2003, Plaintiff reported increased depression and increased panic attacks, family problems, and "some thoughts" of using drugs, adding "but I won't ruin my life." Tr. at 217. Treatment notes from March 24, 2003, are largely illegible, but they indicated that Plaintiff had recently been in drug rehabilitation for 50 days, was living with her father (who was "driving [her] crazy"), and was attending a drug support group five days a week. Her medications included Xanax, Effexor, and Amitriplyline, among others. Tr. at 220. On May 19, 2003, Plaintiff reported that she had been drug-free for four months. Dr. Favazza noted that Plaintiff looked and felt better than she had in a long time, and that she stated that she was going to get a job as soon as her treatment decreased. Tr. at 223. On August 11, 2003, it was noted by Howard Houghton, M.D., the psychiatrist who apparently took over from Dr. Favazza, that Plaintiff was generally doing "reasonably well." Tr. at 264.

Plaintiff was seen at a behavioral health clinic on October 30, 2003. She reported problems with depression since childhood, as well as a methamphetamine problem since the age of 14. Plaintiff reported a history of cocaine, marijuana, and acid use, but that she had been drug-free for three years other than a relapse of one week on methamphetamine in January 2003. Tr. at 286. In November 2003, Plaintiff was hospitalized in a psychiatric ward for about a week due to taking an extra dose of Amitriptyline.

On February 9, 2004, Plaintiff reported to Dr. Houghton that she had recently divorced her husband. Dr. Houghton described Plaintiff as tearful and paranoid, with a history of methamphetamine abuse. He noted that she had recently been started on Geodon (a drug used to treat schizophrenia and bi-polar mania). Tr. at 265.

On March 9, 2004, Plaintiff underwent an annual assessment by the mental health clinic where she was receiving treatment. Plaintiff was pregnant and currently taking Xanax and Effexor. She reported that she had been drug-free for one year and three days. She stated that she had had suicidal and homicidal (toward her father and ex-husband) ideations, but that she had never had a plan or intent to act on these ideations. She was diagnosed with major depressive disorder, panic disorder, history of polysubstance abuse, borderline traits, and a global assessment of functioning ("GAF") of 50.[1] Plaintiff

---

[1]    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders

(continued...)

reported anxiety about taking medications while pregnant, and the risk/benefits of her medications were discussed with her. Tr. at 267-71.

On March 15, 2004, Plaintiff was prescribed a trial regimen of Zoloft and continued on Xanax. Tr. at 272. On April 19, 2004, Plaintiff was described as "overall" seeming calmer, but she reported having had some panic attacks, and her Xanax and Zoloft were increased. Tr. at 275. On May 17, 2004, Plaintiff complained of anxiety and insomnia. Her Xanax was again increased and Zoloft was continued. On mental status examination, Plaintiff had a bland effect, but with no suicidal or homicidal ideation, or psychosis. Tr. at 276.

On June 14, 2004, Plaintiff reported multiple problems including homelessness. She was tired, but appeared to be "in good general health." Tr. at 278. On July 15, 2004, Dr. Houghton described Plaintiff as being less anxious, calmer, pleasant, and cooperative. There was no evidence of suicidal or homicidal ideation or psychosis. Plaintiff's insight and judgment were fair. Tr. at 280. On August 16, 2004, Plaintiff was tolerating her medications without problems. She was described as being pleasant and cooperative and only mildly anxious. Tr. at 281.

Plaintiff was hospitalized for a Caesarian delivery from August 27 to 30, 2004. Tr. at 297-301. When she was seen by Dr. Houghton again on September 9, 2004, her

---

[1](...continued)
(4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

mood and anxiety were described as being good, with no acute problems. On mental status examination, Plaintiff was euthymic,[2] with no psychosis or suicidal ideation. Plaintiff was considered to be "generally stable," and she was continued on Xanax and Zoloft. Tr. at 303.

On November 8, 2004, Dr. Houghton completed a Mental Medical Source Statement - Mental. The check-box form instructed the medical professional that if drug addiction were a diagnosis, to set forth the "limitations remaining if the claimant stopped doing drugs." Dr. Houghton opined that Plaintiff had marked or moderate limitations in all work-related areas of functioning assessed. These included marked limitation in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with others without being distracted, to complete a normal workday and workweek without interruption from psychologically based symptoms, to perform at a constant pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to set realistic goals or make plans independently of others. Dr. Houghton indicated that Plaintiff had moderate limitations in her ability to

_____

[2] "Euthymic" is a medical term used to describe a psychological state that is statistically or otherwise normal, neither elated nor depressed.

remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, to make simple work related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to maintain socially appropriate behavior, to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation. The form contained the following statement, above the signature line: "In responding to the questionnaire, I have excluded from consideration <u>all</u> limitations which I believed resulted from the claimant's conscious malingering of symptoms, and <u>all</u> limitations which I believed resulted from the claimant's drug addiction and/or alcoholism." Tr. at 306-07.

On November 11, 2004, Plaintiff reported to Dr. Houghton that she had been doing reasonably well until three or four weeks prior. Plaintiff reported "vague" complaints of family difficulty, including a report that the family believed that she might be back on drugs, which Plaintiff denied. Plaintiff had a bland affect. Her medications were adjusted, and she was diagnosed with major depression without psychosis. Tr. at 304.

On December 19, 2004, Plaintiff was sent to jail because she failed to produce a urine sample for her probation officer. On January 21, 2005, the jail had her involuntarily admitted to a mental health hospital. According to the discharge summary dated January 25, 2005, Plaintiff reported upon admission to the hospital that she was not

given her medications while in jail, that she was experiencing auditory hallucinations, and that while in jail she had had suicidal thoughts. On mental status examination, Plaintiff appeared sad and expressionless. Her speech was slow and soft, and her behavior was apathetic. Plaintiff was diagnosed with polysubstance dependence. At discharge back to the detention center, she was alert and oriented with no acute medical distress. Plaintiff's speech was normal and her thoughts were goal directed. She denied suicidal or homicidal ideations and hallucinations. She was assigned a current and year-high GAF score of 60. The discharge summary stated that although Plaintiff reported a history of bipolar disorder, the treatment team could not give her that diagnosis because of the drug addiction and the way that methamphetamine abuse could mimic other psychiatric symptoms. The discharge summary also noted that Plaintiff's case worker indicated that Plaintiff had been stable until she went to jail, and that she might be using the hospital as a means of avoiding jail time. Tr. at 309-34.

On April 14, 2005, Plaintiff entered an inpatient dual recovery program for her mental health and drug problems. She was seen by psychiatrist Patricia E. Hogan, D.O., on April 20, 2005. Plaintiff's chief complaint was panic disorder, and recurrent major depression of 10 years. Plaintiff reported that she had been through inpatient treatment for substance abuse nine times and outpatient treatment five times. She reported that she had been drug-free for three and one half years "until November 2004," when she relapsed to methamphetamine use. On examination, Plaintiff was alert and oriented, her flow of thought was logical, mood was anxious and depressed, with full range of affect,

memory was generally intact in all spheres, intellect was normal, behavior was impulsive, and insight and judgment were poor. Plaintiff was diagnosed with "Bipolar Mood Disorder Type I depressed," and methamphetamine dependence, and was assigned a GAF score of 50. Tr. at 350-51.

On April 28, 2005, a comprehensive psychological/clinical assessment of Plaintiff was completed by a clinical social worker, based upon an interview with Plaintiff, and Dr. Hogan's above-described report and diagnosis. Dr. Hogan signed the assessment as psychiatric consultant. The assessment noted that Plaintiff had been in jail for the past four months and had asked to join the recovery program to learn to live drug-free and have her own home with her daughter. Reportedly, her heaviest use of drugs was in 1998 following the death of her mother, and for the past year or two, Plaintiff's "significant other" was a major producer and seller of methamphetamine. Her longest drug-free period was for three years from approximately age 16 to 20. She was also drug-free during her pregnancy. Plaintiff reportedly struggled with schizophrenia and depression for many years, and with learning disability throughout her school years. The assessment stated that "[d]rug abuse, primarily methamphetamine, had significantly impacted [Plaintiff's] functioning, mental status, and relationships," and recommended that Plaintiff participate in both substance abuse treatment and psychiatric rehabilitation services. Tr. at 353-56.

When seen by Dr. Hogan on May 24, 2005, Plaintiff reported that she was "doing pretty good." Tr. at 359. Plaintiff required some medication adjustment on June 22,

10

2005, due to complaints of more anxiety and claims that Geodon was not working. Tr. at 360. On July 19, 2005, Plaintiff reported "a little anxiety during the day." Tr. at 362. On July 26, 2005, she complained to Dr. Hogan of being depressed and tearful, as well as tired and having difficulty sleeping. Plaintiff was noted to be cooperative, with a "neutral and depressed mood," and "restricted' affect. She denied suicidal thoughts or hallucinations. Dr. Hogan decreased Plaintiff's Effexor, and prescribed Wellbutrin, another anti-depressant. Tr. at 363.

On August 2, 2005, after Plaintiff had been a resident at the recovery program for approximately four months, psychologist Stephanie Reid-Arndt, Ph.D., conducted a neuropsychological evaluation, upon referral by Dr. Hogan "due to concerns regarding a decline in [Plaintiff's] cognitive functioning." This examination was five hours in duration. Plaintiff's current medications included Effexor and Geodon. Plaintiff, who Dr. Reid-Arndt considered to be a good historian, reported that she was diagnosed with attention deficit hyperactivity disorder ("ADHD") at the age of eight, and was prescribed Ritalin, which she took until the age of 14. She also reported experiencing increasing problems with language expression (word retrieval), attention/concentration, and multi-tasking in the past year, but she also noticed "a gradual improvement in her cognitive functioning since she stopped using illicit drugs in December 2004." Tr. at 364-65.

Plaintiff reported a long-standing history of depression and anxiety for most of her life, having been diagnosed with depression and anxiety at the age of 14. She mentioned that the death of her mother in 1998 most likely exacerbated her depression and anxiety.

Her family history was noted as significant for depression in her mother. At the time of the evaluation, Plaintiff reported ongoing psychological symptoms including sadness, low energy, and increased appetite. She remained hopeful about completing the treatment program, returning to work, and taking care of her children in the near future. She admitted to using illicit drugs "[o]ver the years," including methamphetamine on a daily basis and LSD/marijuana about once a month, until December 2004. Tr. at 365.

Plaintiff reported that she had worked on an assembly line at a local factory for several years until she was fired in August 2002, because her depression was interfering with her ability to work. She expressed an interest in returning to work, "although she was unable to be specific as to the types of employment." Dr. Reid-Arndt observed that Plaintiff was alert and oriented, although her speech was slow. Her thoughts were relevant and goal oriented, auditory comprehension was intact, affect was flat, and her mood appeared "somewhat depressed." Dr. Reid-Arndt noted that Plaintiff appeared motivated to do well during the testing portion of the evaluation and that Plaintiff seemed to work to the best of her abilities. Accordingly, Dr. Reid-Arndt believed that the results of the evaluation provided a valid estimate of Plaintiff's neuropsychological functioning at that time. Tr. at 364-66.

Dr. Reid-Arndt believed that "[o]verall," Plaintiff appeared to be experiencing several neuropsychological weaknesses that were consistent with her history of ADHD and chronic substance abuse. Intelligence testing revealed that Plaintiff was generally functioning in the low average range of intelligence. Memory for verbal information was

borderline to impaired, memory for visual information was borderline to low average, attention was borderline to low average, language skills were borderline to impaired. Dr. Reid-Arndt recommended that given Plaintiff's her current cognitive and psychological problems, Plaintiff "postpone returning to work until her treatments are completed. Abstinence from drugs will be essential, as further substance abuse is likely to lead to further decline in neuropsychological functioning." Dr. Reid-Arndt diagnosed cognitive disorder NOS; polysubstance dependence, early full remission, by history; ADHD by history; anxiety disorder; and major depressive disorder, recurrent, moderate. Tr. at 367.

Dr. Reid-Arndt encouraged Plaintiff to complete her psychological/substance abuse treatment, as these problems were "likely to be her primary hindrances to successful employment in the future." Dr. Reid-Arndt also stated that Plaintiff would "likely have continued difficulties being gainfully employed," and continued difficulty "in positions which require a high degree of memorization, sustained/divided attention, or complex problem solving." Plaintiff was encouraged to continue working with her psychiatrist in medication management of her psychological symptoms, noting that effectively managing any distress as it arose would be an important component of maximizing Plaintiff's cognitive and overall functioning. Finally, Dr. Arndt offered strategies to help Plaintiff compensate for her cognitive weaknesses, like writing herself notes to aid her recall, and taking regular breaks from tasks which required prolonged attention. Tr. 368-70.

On August 30, 2005, Dr. Hogan completed a Medical Source Statement - Mental. As had Dr. Houghton's medical source statement form, this form instructed the medical professional that if drug addiction were a diagnosis, to set forth the "limitations remaining if the claimant stopped doing drugs." Dr. Hogan indicated that Plaintiff was moderately limited in her ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, and to ask simple questions or request assistance. Dr. Hogan indicated that Plaintiff was markedly limited in her ability to carry out detailed instructions, to make simple work related decisions, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation. Finally, Dr. Hogan indicated that Plaintiff was extremely limited in her ability to understand and remember detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with others without being distracted, to complete a normal workday and workweek without interruption from psychologically based symptoms, to perform at a constant pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, to adhere to basic standards of neatness and

cleanliness, and to set realistic goals or make plans independently of others.  The form completed by Dr. Hogan contained the same statement as did the form completed by Dr. Houghton regarding the exclusion from consideration of <u>all</u> limitations  believed to be the result of Plaintiff's conscious malingering of symptoms, and <u>all</u> limitations believed to be the result of Plaintiff's drug addiction and/or alcoholism.  Tr. at 346-47.

**Evidentiary Hearing of October 28, 2004**

Three individuals testified at the evidentiary hearing:  Plaintiff, a community support specialist, and a vocational expert ("VE").  Plaintiff, who was represented by counsel, testified that she was 28 years old, had a 12th grade education, and had taken some classes at a community college.  For the past eight months she had been living in her own apartment, now with her two-month-old baby.  Before that, she lived with her father for four months.  Plaintiff was able to drive "when [she] had to."  At her most recent job, which she held from June 2000 to August 2002, she "worked on the line in the commissary and prepared food for vending machines."  She later described this job as sitting in the back by herself, making labels and expiration dates to be affixed to the food items.  She was fired from this job because she missed too much work.  Before that, she worked for a laundry service folding laundry, as a line-worker at a shoe factory, and for about a half of year, taking phone orders for a publishing company.  Plaintiff testified that she could no longer work because she could not "be around anybody," and "from time to time," got so depressed that she could not leave the house.  She testified that when she

worked at the shoe factory, her anxiety level got so high that she "just started shutting down and getting tired," and fell asleep on the line.  Tr. at 41-45, 81.

Plaintiff stated that she had been seeing a doctor, currently Dr. Houghton, continually every month since 1999, with the doctors prescribing medications for anxiety, depression, sleep, and schizophrenia.  Currently, she was taking Zoloft for depression, and Xanax for anxiety (one in the morning, one at noon, and three at bedtime).  She had been taken off her other medications, including those for schizophrenia in April 2004, due to the pregnancy, and she did not want to go back on them, because she "thought [she] was doing fine," but Effexor was going to be re-prescribed.  Plaintiff testified that in November 2003, she was hospitalized in a psychiatric ward for about a week due to taking an extra dose of Amitriptyline after she forgot that she had taken the first dose. Plaintiff testified that she had never previously been hospitalized for psychiatric reasons. Tr. at 46-49, 52, 62.

Plaintiff testified that she now spent her days taking care of her baby.  She had been physically ill during the pregnancy, with morning sickness that lasted all day.  Also, it was a high-risk pregnancy due to the medications she had been taking.  Since she stopped working, she moved several times, including into her father's house.  During her stay there, she took care of the house, and slept a lot.  Plaintiff testified that sometimes she felt like she could not get up, and that once she had gone a week without getting up and getting dressed.  Plaintiff testified that, other than regularly seeing a psychiatrist, she did not go for other therapy for her mental problems, although it may have been

suggested to her several times.  She testified that at times she felt like she needed to go for psychotherapy, but did not make herself do it.  Tr. at 50-54.

When she was not taking care of her baby, she would help clean her father's house.  She testified that she could also take care of her own household, cleaning, cooking, preparing meals, shopping, and doing laundry, adding, however, that it "takes a lot out of me and I have to talk myself into it for about three to five days before . . . ."  Plaintiff testified that she went to church with friends sometimes, although not very often since her mother's death in 1998.  Tr. at 55-58.

Upon examination by her attorney, Plaintiff testified that when she was depressed, which happened about two days a week, she would just stare at the wall for hours and did not feel like going out.  On the days after such days, she would have difficulty getting up.  On her better days, she would get up for several hours, and then have to lie down to take a nap.  She stated that the Zoloft was no longer working, adding that when she had been on Effexor for five or six years, "I never had a problem with that whatsoever, even through hard times."  Plaintiff testified that she would feel anxious daily, to the point where she could not think straight, "like now."  She also had panic attacks about twice a week, even on her medications.  Tr. at 59-62.

Plaintiff stated that she felt like she had a schizophrenic episode on the morning of the hearing -- she was worried that an unfriendly neighbor was trying to get into her house.  When she felt this way, she would lock the doors all the time.  She stated that she also had paranoid thoughts.  She did not like taking shower when she was alone, she

thought that her father's new wife, with whom she once had an explosive fight, lied to her all the time, and she had problems getting along with her co-workers in her previous job. She noted that her supervisor on that job allowed her to take short catnaps once or twice a day, in addition to regular work breaks. Plaintiff stated that she also had problems with concentration, and would forget things. Tr. at 63-65.

Plaintiff stated that a friend helped her take care of the baby every day and every night, "all the time," letting Plaintiff sleep late or take a nap when Plaintiff had to. She had two other children, 10-year old twins, who lived with their father since April 2004, when she started feeling ill with the new pregnancy. Plaintiff acknowledged that she was placed on probation in 2000 for manufacturing methamphetamine in 1998. Her probation was terminated in January 2005. She had been to drug rehabilitation several times. The first time was for cocaine and marijuana use when she was 18. Her last time was in 2003 at an in-patient facility, where her stay was extended for behavioral problems. Plaintiff stated that she was participating in a support group for methamphetamine users "once in a while." Tr. at 66-70.

The ALJ then asked Plaintiff if she had any physical limitations. Plaintiff testified that she cut her wrists on a window two years ago which resulted in the loss of feeling in the upper part of her fingers. She also had asthma and used an inhaler four times a day. She went to the emergency room about once a year due to the asthma; she would be treated with a nebulizer and never required hospitalization. Tr. at 71-73.

Jennifer White, a community support specialist, testified that she worked with Plaintiff since February 2005, normally meeting with Plaintiff for about one hour each week, to help Plaintiff with medication management, developing coping strategies for her symptoms, locating community resources, making Plaintiff feel comfortable going out in the community, and daily living skills. White testified that Plaintiff was compliant with her medications. She testified that at times Plaintiff was too tired or did not feel like going out, and at those times White would just sit with Plaintiff and talk to her. White believed that Plaintiff was paranoid, always afraid something was going to happen to her. Plaintiff could be very explosive at times, unable to control her emotions and actions. White stated that Plaintiff seemed to be taking care of her baby's needs. Tr. at 73-79.

A VE was asked whether there were jobs that could be performed by a hypothetical individual of Plaintiff's age, education, and work experience, who would be limited to simple work that did not require close interaction with the general public or close team work, and who should avoid concentrated exposure to noxious environments. After questioning Plaintiff about her past jobs, the VE testified that Plaintiff's jobs at the vending machine food company, the shoe factory, and the laundry involved simple work, with little public contact, and clean environments, and that the hypothetical individual could perform those jobs. The ALJ asked whether competitive work would be precluded if the same hypothetical person would miss in excess of two days a month on more months than not, for physical or mental medical reasons. The VE answered, "[i]t would on these direct, unskilled jobs," as missing two days a month would be the absolute

maximum one could miss and still retain these jobs. The ALJ then asked whether employment would be precluded if the hypothetical person could make it to work every workday, but about once a week had to come in late, leave early, or have longer breaks than regular. The answer was yes, as there was very little tolerance "for that type of behavior" in direct entry unskilled jobs. Tr. at 80-86.

## ALJ's Decision of December 22, 2005

The ALJ reviewed the law with regard to the consideration a claimant's substance addiction is to be given in making a disability determination. The ALJ stated that pursuant to a 1996 change in the law,

> [a] claimant can no longer be considered to be eligible for disability benefit payments . . . if substance addiction is a contributing factor material to any formal finding of disability under the Social Security Act. A history of alcoholism or drug addiction is still relevant to the extent that it may have resulted in serious secondary damage to a claimant, such as damage to the brain, liver, or other vital organ. . . . . Other physical and mental impairments will still be evaluated in accordance with existing law. However, the mere fact that a claimant uses or has used alcohol or drugs, and may even be addicted to same, is no longer a basis for entitlement to disability benefits under this Act.

Tr. at 17.

In reviewing the testimony at the hearing, the ALJ stated that Plaintiff had testified that she was doing fine on Zoloft, and did not want to be changed to Effexor and Geodon. The ALJ found that Plaintiff's alleged numbness in her fingers was not a "severe" impairment, but that her bipolar type I disorder, panic disorder, substance dependence, and asthma were "severe" impairments, as that term is defined in the Commissioner's

regulations.[3]  The ALJ found that, taking into account the effects of substance dependence, Plaintiff's mental impairments constituted a depressive disorder that would be deemed disabling under listing 12.09 (Substance Addiction Disorders) of the Commissioner's regulations, 20 C.F.R., Part 404, Subpart P, Appendix 1 ("Appendix 1"), "in that she had behavioral changes associated with regular use of substances that affect the central nervous system," resulting in marked difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  Tr. at 18-19.

The ALJ found, however, that "absent the effects of methamphetamine abuse, the symptoms of [Plaintiff's] other mental impairments would be less severe and that substance abuse [was] material to the outcome of the determination in this case."  Tr. at 19.  In summarizing the medical record, the ALJ included the following:  "The claimant reported [to Dr. Hogan on April 20, 2005] that she had been clean 3½ years until November 11, 2004, when she relapsed to methamphetamine use.  This assertion is inconsistent with the claimant's previous statements to Dr. Houghton that she no [sic] engaged in drug abuse at that time."  Tr. at 21.[4]

The ALJ  stated that he did not find Dr. Houghton's November 8, 2004 assessment to be credible "in absence of the effects of substance abuse."  The ALJ stated that Dr.

_____

[3]     Under the regulations, a severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

[4]     As will be discussed later, the Court notes that Dr. Hogan's report notes only indicated that Plaintiff claimed to have been drug-free until November 2004, without specifying any particular date in that month.

Houghton's assessment was not supported by his observations in his medical treatment notes "which showed improvement in [Plaintiff's] condition; particularly in circumstances when [Plaintiff] was taking prescribed medication and abstaining from substance abuse."  Tr. at 22.

The ALJ similarly discredited Dr. Hogan's August 30, 2005 report on the basis that the "extreme limitations" noted therein did not find support in Dr. Hogan's contemporaneous treatment notes.  The ALJ stated as follows:

> Although the form prepared by [Plaintiff's] attorney, indicated that the assessment prepared by Dr. Hogan did not include limitations associated with alcohol or drug abuse, Dr. Hogan indicated in her narrative assessment of April 28, 2005, that drug abuse, primarily methamphetamine, had significantly impacted [Plaintiff's] functioning, mental status.  Dr. Hogan in fact encouraged [Plaintiff] to participate in substance abuse programs.

Id.  The ALJ added that Dr. Reid-Arndt also recommended that Plaintiff complete her psychological/substance abuse treatment, as these problems were likely to be her primary hindrance to successful employment in the future.  Id.

The ALJ further stated that Plaintiff's assertions regarding periods of abstinence from substance abuse were not always consistent, "further putting into doubt the assessments of Drs. Houghton and Hogan."  According to the ALJ, Plaintiff's symptoms appeared to be worse at or near periods of substance abuse.  The ALJ concluded that absent the effects of substance abuse, Plaintiff had only mild restrictions in activities of daily living; moderate difficulties maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace if required to do detailed or complex

work, but only mild limitations if limited to unskilled tasks that could can be learned within 30 days; and no episodes of decomposition of extended duration. These symptoms did not meet or equal in severity any of the Commissioner's listed deemed-disabling mental impairments (listings 12.02-12.10 in Appendix 1). Tr. at 22-23.

The ALJ then assessed Plaintiff's RFC to determine whether Plaintiff could perform her past relevant work or, if not, other work, citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), for the relevant factors in evaluating allegations of disability. The ALJ noted Plaintiff's poor work record prior to the alleged onset date of disability, with few years of full-time employment. The ALJ found that Plaintiff's abilities to think, understand, remember, communicate, concentrate, get along with other people, and handle normal stress were not impaired to the extent that they would preclude simple work with limited public contact and no close team-work. He once again stated that absent the effects of substance dependence, Plaintiff had no more than mild or moderate mental limitations. He found that when not engaging in substance abuse, Plaintiff's medications "effectively reduce[d] the symptoms related to the established impairments," and that there was no indication that Plaintiff was not taking her medications as a result of a psychiatric condition. Tr. at 23.

The ALJ also stated that Plaintiff did not "display any signs of significant mental dysfunction during the course of the hearing," and that White's testimony added little support to Plaintiff's allegations of disability. The ALJ gave Plaintiff the benefit of the doubt with respect to her asthma, finding that certain precautionary lung-related

restrictions should be placed on her.  The ALJ stated that "[o]verall," he did not find

Plaintiff's allegations of disability absent the effects of substance abuse to be credible.

Tr. at 23-24.

The ALJ concluded that Plaintiff had the RFC, absent substance abuse, to perform

simple work not requiring close interaction with the general public or with coworkers,

and not involving high concentrations of pulmonary irritants.  The ALJ found that

Plaintiff had past relevant work as a commissary worker (box packer), linen folder, and

receptionist.  Then ALJ stated that the VE testified that based upon this RFC, Plaintiff

could return to her past relevant work as a commissary worker (box packer) and a laundry

worker, as previously performed by Plaintiff and as generally performed in the national

economy.  ALJ found that as Plaintiff had performed these jobs at the "substantial gainful

activity level," she was not disabled as defined by the Act.  Tr. at 24.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005).  This "entails 'a more scrutinizing analysis'" than the substantial evidence

standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)).  The

court's review "'is more than an examination of the record for the existence of substantial

evidence in support of the Commissioner's decision'"; the court must "'also take into

account whatever in the record fairly detracts from that decision.'"  Id.  (quoting Haley v.

Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not warranted, however,

"'merely because substantial evidence would have supported an opposite decision.'"  Id.

(quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

    To be entitled to benefits, a claimant must demonstrate an inability to engage in

any substantial gainful activity which exists in the national economy, by reason of a

medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Work which exists in the national

economy "means work which exists in significant numbers either in the region where

such individual lives or in several regions of the country."  Id. § 423 (d)(2)(A).  Both the

impairment and the inability to engage in substantial gainful employment must last or be

expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22

(2002).

    The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520,

establishing a five-step sequential evaluation process to determine disability.  The

Commissioner begins by deciding whether the claimant is engaged in substantial gainful

activity.  If so, benefits are denied.  If not, the Commissioner decides whether the

claimant has a "severe" impairment or combination of impairments.  A severe impairment

is one which significantly limits a person's physical or mental ability to do basic work

activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

**Special Procedure when Substance Abuse is Involved**

In 1996, the Social Security Act was amended to reflect changes in the award of benefits related to substance abuse. The amended statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). This amendment is interpreted as barring benefits "if alcohol or drug abuse comprises a contributing factor material to the determination of disability." Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).

Title 20 C.F.R. § 404.1535 details how the Commissioner is to evaluate whether substance abuse is material in determining disability, as follows:

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

"The ALJ must reach [a] determination [of disability] initially . . . using the standard five-step approach . . . without segregating out any effects that might be due to substance use disorders." Brueggemann, 348 F.3d at 694. "If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent." Id. (citing Pettit v. Apfel, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 404.1535(b)(2)).

In the determination of "whether the substance abuse is 'material,' the claimant has the burden of demonstrating that she would still be disabled if she were to stop using drugs or alcohol." Vester v. Barnhart, 416 F.3d 886, 888 (8th Cir. 2005) (citing Pettit, 218 F.3d at 903. "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause." Pettit, 218 F.3d at 903. Thus, even if long-term substance abuse causes a disability, such as cognitive losses, substance abuse will not be found "material" to the

finding of disability, if the disability remains after the claimant stops the substance abuse. When the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. Brueggemann, 348 F.3d at 695 (citing Pettit, 218 F.3d at 903).

Here, the ALJ followed the proper procedure of first determining Plaintiff was disabled, taking into account Plaintiff's drug abuse. The ALJ then decided at step four of the sequential evaluation process, that were it not for her drug abuse, Plaintiff could return to her past work as a commissary worker (box packer) or laundry worker.

**Weight Given Treating Psychiatrists' Opinions/Assessment of Plaintiff's RFC**

Plaintiff argues that the ALJ committed reversible error by failing to properly consider Dr. Houghton's November 8, 2004 mental assessment, and Dr. Hogan's August 30, 2005 mental assessment of Plaintiff's ability to do work-related activities. Both physicians were psychiatrists, both were Plaintiff's treating physicians, both assessed limitations which were far more severe than factored into the ALJ's RFC determination, and both stated that the assessment of Plaintiff's limitations excluded from consideration all limitations believed to have resulted from Plaintiff's drug addiction. Plaintiff argues that in addition to being consistent with each other, Dr. Hogan's August 30, 2005 assessment was consistent with Dr. Hogan's own contemporaneous treatment notes of July 26, 2005, when Dr. Hogan noted tearful depression and prescribed Wellbutrin. Similarly, Plaintiff argues that the assessment of Dr. Houghton in question was consistent with his treatment notes, which noted serious depression at several points during his

treatment history with Plaintiff. In addition, Dr. Houghton consistently prescribed medications for Plaintiff's mental/emotional problems, even when he noted some improvement in her condition.

Plaintiff also faults the ALJ for ignoring Dr. Reid-Arndt's diagnosis of cognitive disorder, anxiety disorder, and major depressive disorder, which was consistent with the opinions of Drs. Houghton and Hogan. Plaintiff further argues that there is no medical evidence to support the ALJ's determination that absent the effects of drug abuse, Plaintiff had the RFC to perform simple work with the only limitations of not having contact with the public or close contact with co-workers, and needing to work in an environmentally clean atmosphere.

The weight that the ALJ should give a medical opinion is governed by a number of factors, including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2); see also Leckenby v. Astrue, 487 F.3d 626, 634-35 (8th Cir. 2007). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician

renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (citation omitted).

Here, the Court does not believe that the record supports the ALJ's statement that the two treating physicians' opinions in question are inconsistent with the physicians' respective treatment notes, or with other evidence in the record. Dr. Houghton consistently provided Plaintiff with psychiatric medications and medication adjustments, and consistently documented that she suffered from recurrent depressive disorder and panic disorder. Even when he noted that Plaintiff showed some improvement, his prescribed medications were increased, and he noted that she still suffered from symptoms. See Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (noting that treatment notes indicating that patient who suffered from mental illness was "doing well" had "no necessary relation to a claimant's ability to do work"); Hunter v. Astrue, 2007 WL 1650414, at *14 (N. D. Iowa June 5, 2007) (holding that occasional comments in the medical record that plaintiff, who had been diagnosed with borderline intelligence and bi-polar disorder, was "fairly stable" and exhibited "some improvement" was not substantial evidence to support the conclusion that plaintiff could perform simple, unskilled work).

As Plaintiff points out, Dr. Hogan's treatment notes from July 23, 2005, indicated that Plaintiff was depressed and tearful, and Plaintiff was started on Wellbutrin. Furthermore, contemporaneous with her completion of the medical source statement in question, Dr. Hogan referred Plaintiff for neuropsychological testing, due to concerns regarding a decline in Plaintiff's cognitive functioning. Besides being consistent with

31

their own treatments notes, Drs. Houghton's and Hogan's opinions with regard to Plaintiff's functional limitations are consistent with each other, except that Dr. Hogan found even more limitations than did Dr. Houghton. There is no evidence that two treating psychiatrists did not in fact assess Plaintiff's abilities without considering added limitations from Plaintiff's drug addiction, as they said they did.

The Court also finds that the treating psychiatrists' opinions are not inconsistent with Dr. Reid-Arndt's evaluation, which found serious cognitive deficiencies. Although both Dr. Hogan and Dr. Reid-Arndt stated that Plaintiff's past drug abuse, along with her mental impairments, was a major hindrance to future employment, the Court does not believe that these statements provide substantial evidence to support the ALJ's decision that absent drug abuse, Plaintiff was employable.

Nor is it entirely clear that there were inconsistencies in Plaintiff's statements regarding when she was drug-free, another factor relied upon by the ALJ to discredit Drs. Houghton and Hogan's assertions that their assessments of Plaintiff's abilities excluded the affects of Plaintiff's drug abuse. The ALJ believed that Plaintiff's report to Dr. Hogan on April 20, 2005, that she had been drug-free for 3½ years until November 2004, when she relapsed to methamphetamine use was inconsistent with Plaintiff's previous statement to Dr. Houghton on November 11, 2004, that she was not engaged in drug abuse at that time. It is very possible that the admitted relapse in question was after November 11, 2004, removing any inconsistency.

In sum, the Court does not believe that the record supports the ALJ's discounting the opinions of Plaintiff's treating psychiatrists with regard to Plaintiff's functional limitations, absent consideration of her drug abuse. See, e.g., Leckenby, 487 F.3d at 633 (substantial evidence did not support ALJ's decision to reject plaintiff's treating physician's opinion, which was consistent with the physician's treatment notes, with respect to rest-period requirements).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell, 259

33

F.3d at 711).  The ALJ is therefore required to consider at least some supporting evidence from a medical professional.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In Vester v. Barnhart, 416 F.3d 886, the Eighth Circuit expressed "some doubt" as to whether a claimant's ability to work in the absence of substance abuse is a medical question comparable to the traditional determination of a claimant's RFC.

> Put simply, if an ALJ is presented with evidence that a claimant has demonstrated the ability to work during periods of sobriety, it seems within the ken of the ALJ to make a factual finding that the claimant is able to work when she is not abusing alcohol.  This sort of judgment, based largely on historical facts, strikes us as different in kind from that required when a claimant presents a set of medical problems, and the ALJ must make a predictive judgment as to the claimant's ability to work in light of a given medical condition.

Id. at 891.

In any event, upon review of the entire record, the Court concludes that although the record contains evidence that Plaintiff has some limited ability to function in the workplace, the record does not contain substantial evidence that she could perform the requisite work-related activities "day in and day out," without missing at least two days a month, or without needing to come in late, leave early, or take more than the normal work breaks.  The assessments of Plaintiff's treating psychiatrists establish, at the very least, that such limitations would apply to Plaintiff.  The uncontroverted evidence was that she was fired from her job as a box-packer because she missed too much work due to her depression.  The VE testified that with such limitations, which were encompassed in the ALJ's second and third hypothetical, Plaintiff could not be gainfully employed.   In sum,

the Court concludes that the record shows that, absent her substance abuse, Plaintiff could not perform her past work, or any other jobs that exist in significant numbers in the economy, and that she is thus entitled to disability benefits.

Under such circumstances, the proper action is for the Court to reverse the decision of the Commissioner, and remand the case to the Commissioner for the calculation and award of benefits. "[W]here the record itself convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits," without a remand for a rehearing or reconsideration, is appropriate. Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir.1991). The Eighth Circuit recently took such action in Wilson v. Astrue, ___ F.3d ___, 2007 WL 2050836 (8th Cir. July 19, 2007), where, as here, there was significant evidence from the plaintiff's treating psychiatrists and other health care professionals that the plaintiff suffered from mental illnesses, such that there were "likely no significant number of jobs in the economy" that the [the plaintiff] could perform." Id. at *3. Similarly, in Duncan v. Barnhart, 368 F.3d 820 (8th Cir. 2004), the Eighth Circuit reversed and remanded for the calculation and award of benefits, having determined that the ALJ improperly discounted the opinion of the plaintiff's treating psychotherapist, and substantial evidence in the record did not support a finding that the plaintiff had the physical or mental capacity to hold a job "day in and day out." Id. at 823-24.

## CONCLUSION

The Court concludes that the Commissioner's reasons for not crediting the opinions of Plaintiff's treating psychiatrists are not supported by the record. The ALJ's decision that, absent the effects of substance abuse, Plaintiff was not disabled, is not based upon substantial evidence. Rather, the Court believes that the opinions of Drs. Houghton, Hogan, and Reid-Arndt, in conjunction with the VE's testimony, supports Plaintiff's allegations of disability.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits, based upon Plaintiff's alleged disability onset date.

The parties are advised that they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated August 3, 2007.